# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-727


ANGIE BROWN

VERSUS

SHOP RITE, INC.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - #2
PARISH OF RAPIDES, NO. 10-00760
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE


\*\*\*\*\*\*\*\*\*\*


## ULYSSES GENE THIBODEAUX
## CHIEFJUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and J. David Painter, Judges.


**REVERSED IN PART AND RENDERED;
AFFIRMED IN PART AND AMENDED.**


George Arthur Flournoy
Flournoy & Doggett (APLC)
P. O. Box 1270
Alexandria, LA 71309
Telephone: (318) 487-9858
COUNSEL FOR:
   Plaintiff/Appellant - Angie Brown


Heather W. Blackburn
Rabalais, Unland & Lorio
200 Caroline Court
Covington, LA 70433
Telephone: (985) 893-9900
COUNSEL FOR:
   Defendant/Appellee - Shop Rite, Inc.

**THIBODEAUX, Chief Judge.**

Angie Brown slipped and fell on a wet floor while working for her employer, Shop Rite, Inc., in Natchitoches, Louisiana. She injured her right knee, low back, and tail bone. Shop Rite paid Ms. Brown workers' compensation wage and medical benefits after the accident but discontinued the wage benefits a short time later and denied Ms. Brown a change in physicians.

The matter was heard by the Office of Worker's Compensation (OWC). The Workers' Compensation Judge (WCJ) awarded benefits and penalties for specific periods of time, but denied benefits and penalties, as requested by Ms. Brown, for other periods of time. Ms. Brown filed this appeal. Finding manifest error on the part of the OWC in some of its awards, we reverse in part and affirm and amend in part the judgment issued by the OWC.

I.

**ISSUES**

We must decide:

(1)     whether the trial court manifestly erred in finding that Ms. Brown was not entitled to wage benefits after July 7, 2010;

(2)     whether the trial court manifestly erred in denying Ms. Brown penalties, pursuant to La.R.S. 23:1201(I); and,

(3)     whether the trial court abused its discretion in awarding Ms. Brown only $6,500.00 for her attorney fees in this case.

II.

**FACTS AND PROCEDURAL HISTORY**

On October 10, 2009, Angie Brown, a thirty-one-year-old cook for Shop Rite, slipped and fell in water on her employer's floor. Ms. Brown fell hard on her bottom; her right leg twisted backward, and she heard a pop in her right

knee. She also injured her low back and coccyx, or tail bone. The following day, Ms. Brown's sister drove her to the Natchitoches Parish Hospital emergency room (ER), where she was diagnosed with a right knee sprain. She was given an injection, a knee immobilizer, and crutches. Ms. Brown was also given medication, a work release for a week, and she was told to follow up with her regular physician. Five days later, Ms. Brown was seen by Dr. Luis Matta at Outpatient Medical Centers, Inc. for right knee and low back pain. She was continued off work and referred to an orthopedist, Dr. Steven Kautz.

Ms. Brown saw Dr. Kautz on October 29, 2009. Her knee was swollen and slipping; she had tailbone pain causing her to limp. Dr. Kautz diagnosed a "Right knee Grade I MCL strain," put her in a hinged knee brace, and limited her to light duty if available. If light duty was unavailable, he recommended time off from work. Ms. Brown returned to work but averaged only a few hours a week during the eight weeks following the injury.

Dr. Kautz ordered an MRI and reported on December 15, 2009, that the MRI was suggestive of a lateral meniscus tear. He discussed arthroscopic evaluation, but Ms. Brown was hesitant about the surgery. Dr. Kautz continued Ms. Brown's off-work status for another week and opined that if she did not have surgery, he would "probably consider making her situation permanent and stationary at that point."

On December 17, 2009, there was still swelling, and Ms. Brown decided on the arthroscopic surgery. Dr. Kautz reported that Ms. Brown was totally incapacitated, and there was no recommendation for a return to work. He did not see her again after December 17, 2009. Surgery was scheduled for January 7, 2010. Ms. Brown had second thoughts and cancelled the surgery. The claims adjuster for Shop Rite faxed a hand-written request to Dr. Kautz regarding Ms. Brown's work status.

On January 8, 2010, without having seen Ms. Brown since discussing surgery with her in December, Dr. Kautz returned the hand-written fax to the adjuster with two check marks in the "yes" responses, indicating that Ms. Brown could return to full-duty work status and without any restrictions. Shop Rite terminated Ms. Brown's benefits.

Ms. Brown filed a workers' compensation claim and requested a change in physicians to another orthopedist, Dr. John Ferrell. Shop Rite did not approve or pay for treatment by Dr. Ferrell. Dr. Ferrell found back strain and patellar dislocation of the right knee with painful subluxation. He recommended a patellofemoral brace and physical therapy for patellar rehabilitation before entertaining surgery. He prescribed Darvocet for pain control. By April of 2010, Ms. Brown's knee still gave out occasionally; she still limped and had to sit over to one side to relieve the tailbone pain, but her overall pain level was down, and she was improving. Dr. Ferrell encouraged her to stay off her tail bone and to continue her strengthening exercises to avoid knee surgery.

As of July 8, 2010, Dr. Ferrell released Ms. Brown to light, sedentary work and restricted her from climbing, squatting, prolonged walking, and from lifting over twenty-five pounds. Ms. Brown looked for work but could not find anyone to hire her with the restrictions due to her injuries.

Ms. Brown sought reinstatement of her wage benefits, medical treatment by Dr. Ferrell, penalties, and attorney fees. The matter was tried by the OWC on September 30, 2010. The WCJ awarded $6,800.00 in penalties under La.R.S. 23:1201(F) for various non-payment or untimely payment of benefits, $6,500.00 in attorney fees, the payment of all treatment by Dr. Ferrell, supplemental earnings benefits (SEBs) for November and December of 2009, and temporary total disability (TTD) benefits for January through July 7, 2010. The

WCJ did not award SEBs as of July 8, 2010, when Dr. Ferrell released Ms. Brown to light duty with restrictions.

Ms. Brown appeals the Judgment of the OWC for its failure to award SEBs as of July 8, 2010, for its failure to award penalties under La.R.S. 23:1201(I), and for its failure to award an appropriate attorney fee.

III.

**STANDARD OF REVIEW**

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). "The same standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of an administrative body or hearing officer." *Alexander v. Pellerin Marble & Granite*, 93-1698 p. 6 (La. 1/14/94), 630 So.2d 706, 710 (citations omitted).

IV.

**LAW AND DISCUSSION**

*Supplemental Earnings Benefits as of July 8, 2010*

The WCJ awarded Ms. Brown benefits based upon the following factual findings: TTD benefits from the date of the injury, October 10, 2009, through October 16, 2009 – for the first week of disability; SEBs from November 1, 2009, through December 31, 2009 – for the limited amount of post-injury work that she did at Shop Rite in the eight weeks following the accident; TTD benefits for January 16, 2010 through July 7, 2010 – for the period of time that she was unable to work before being released to light duty by Dr. John Ferrell. However, the trial court denied Ms. Brown's request for SEBs as of July 8, 2010. In spite of finding that Dr. Ferrell had only released her to light duty, sedentary work, the

4

WCJ also found that Ms. Brown had not shown that she was unable to earn ninety percent of her pre-injury wages with the restrictions set by Dr. Ferrell.

Ms. Brown contends that the trial court erred in denying her SEBs after July 7, 2010. We agree. Ms. Brown, however, citing *Mallery v. International Harvester Co.*, 96-321 (La.App. 3 Cir. 11/6/96), 690 So.2d 765, *writ denied*, 97-1323 (La. 9/5/97), 700 So.2d 512, contends that there were no facts in dispute to be determined and that it was legal error, not manifest error, to deny the benefits. We find that there are sufficient facts in dispute regarding her entitlement to SEBs to apply the legal standard of manifest error. Accordingly, we find that it was manifest error to deny Ms. Brown SEBs after July 7, 2010.

"The purpose of [SEBs] is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840, p. 8 (La. 7/1/97), 696 So.2d 551, 556 (quoting *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52, 55 (La.1993)). In order to obtain SEBs, the claimant must show by a preponderance of the evidence that his work-related injury resulted in an inability to earn wages equal to at least ninety percent of his pre-disability wages. La.R.S. 23:1221(3)(a). Any post-injury sums received by the employee will be considered wages he is able to earn, even if the earnings are from odd-lot employment, sheltered employment, or employment while working in pain. La.R.S. 23:1221(3)(b).

> Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn [ninety percent] under the facts and circumstances of the individual case. *Banks*, [696 So.2d] at 556. . . . It is only when the employee overcomes this initial step that the burden shifts to the employer to prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employee's community or reasonable geographic location. La.R.S. 23:1221(3)(c)(i); *Banks*, [696 So.2d] at 556; *Daigle* [*v.*

5

*Sherwin-Williams Co.*, 545 So.2d 1005, 1009 (La.1989)].
*Poissenot v. St. Bernard Sheriff's Office*, 09-2793, p. 5 (La. 1/9/11), 56 So.3d 170, 174 (footnote omitted).

As of July 8, 2010, Dr. John J. Ferrell, Ms. Brown's second orthopedic surgeon, stated that Ms. Brown still had a pain level of six over ten. He opined that Ms. Brown could probably return to work in a light-duty, sedentary position, but he would limit her from climbing, squatting, and stairs, because of her back and knee issues. He further testified that she should not do prolonged walking, but could walk intermittently on a flat surface, and that she should not lift over twenty-five pounds. The record contains a letter from Ms. Brown's hiring manager/supervisor, Perry Vowell, dated October 29, 2009, nineteen days after the accident, stating that "Angie" needed to be able to work an eight-hour shift that included mopping floors, lifting cases of product up to fifty pounds, squatting, bending, continuous walking, reaching for items above her head, and climbing a stepladder occasionally.

The letter was addressed to Dr. Kautz, Ms. Brown's previous orthopedist. Attached as page two of the letter was Shop Rite's "Deli Associate Job Description" listing her duties as cooking, preparing food, washing dishes, mopping floors, cleaning tables, operating cash register, waiting on customers, and lifting product of approximately twenty pounds. The job description in Ms. Brown's hiring packet listed operation of cash register and other guest service equipment, stocking and maintaining merchandise for sale, daily cleaning duties, a willingness to work extra hours and days off, and performing other job responsibilities as directed by the manager and assistant manager. The record contains yet another "Store Associate/Cashier Job Description" listing the above duties in addition to the following: lifting product of approximately thirty pounds, picking up and putting out trash, dusting shelves, filling cooler, bagging ice, icing

beer and drinks, draining containers, sweeping parking lot, and cleaning gas pumps, restrooms, floors, toilets, sinks, mirrors, doors and windows.

Shop Rite argues that Ms. Brown testified that she worked as a cook, not a cashier, and that she never provided Dr. Ferrell a job description for his approval. This argument has no merit. The record reveals that Ms. Brown applied for the position of cook and cashier, and that, while she had not yet cashiered, she had numerous duties in addition to preparing food and cooking. The letter from her manager indicates that her job duties exceeded all of the limitations later pronounced by Dr. Ferrell, and the hiring packet materials indicate that she would be expected to perform as directed by her managers. The record is replete with descriptions of work duties expected of Ms. Brown that do not fit into the limitations stated by Dr. Ferrell. Notwithstanding, Ms. Brown did try to work at Shop Rite after her October accident, averaging less than four hours a week over the next eight weeks.

In denying Ms. Brown's request for SEBs after Dr. Ferrell released her in July 2010 to light, sedentary work, the WCJ pointed out that it is not enough to show that you cannot return to your prior employment. He cited *Poissenot, 56 So.3d 170,* which reversed the Louisiana Fourth Circuit Court of Appeal's decision to affirm an award of SEBs because the claimant could not return to work as a Deputy Sheriff. Finding that the workers' compensation court and the court of appeal had applied an incorrect standard, the Louisiana Supreme Court in *Poissenot* stated as follows:

> La.R.S. 23:1221(3)(a) requires that a claimant prove by a preponderance of the evidence that he is unable to earn **wages** equal to ninety percent or more of wages he was earning at the time of injury "***whether or not** the same or similar occupation as that in which the employee was customarily engaged when injured.*" (Emphasis added). The statute clearly places its focus on the amount of wages earned before and after the accident, not the type of occupation or the type of work performed.

7

*Poissenot*, 56 So.3d at 175.

In *Poissenot*, where the claimant was released to full, medium-level duty and did indeed return to his former employment at full salary until laid off with many others after Hurricane Katrina, the Louisiana Supreme Court found that Poissenot did not meet his initial burden of proving that he could not earn ninety percent of his pre-injury wages. The court also stated:

> The analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage. *Daigle*, [545 So.2d] at 1007. Further, factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Smith v. Louisiana Dept. of Corrections*, 93-1305 (La. 2/28/94), 633 So.2d 129, 132; *Freeman v. Poulan/Weed Eater*, 93-1530 (La. 1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Freeman*, [630 So.2d] at 737-38; *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La.1993); *Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). "In determining whether a [WCJ's] finding that an employee has met his initial burden of proving entitlement to SEBs is manifestly erroneous, a reviewing court must examine **all** evidence that bears upon the employee's inability to earn 90% or more of his pre-injury wages." *Seal v. Gaylord Container Corp.*, 97-0688 (La. 12/2/97), 704 So.2d 1161, 1166.

*Poissenot*, 56 So.3d at 174-75.

In *Seal v. Gaylord Container Corp.*, 704 So.2d 1161, quoted above by the *Poissenot* court, the claimant sustained an occupational disease from working with noxious chemicals and could not return to his former employment making $17.36 per hour. He had been employed by Gaylord for thirty-seven years and had done specialized work as a "bogol operator" for the fifteen years preceding his diagnosis. Mr. Seal testified that he looked for alternative work but was unable to find a job which paid more than minimum wage. The court found that the medical

and lay testimony corroborated his testimony. Where he had a limited education, a specialized work history, and no other skills than those of a paper mill worker, and where his pre-injury earnings were more than three times the minimum wage, the court found that he had met his initial burden of proving that he was unable to earn ninety percent of his pre-injury wages and was therefore entitled to SEBs.

Similarly, the record here reveals that Angie Brown has more than physical limitations. Ms. Brown has had a learning disability, for which she receives social security assistance, since childhood. She did not finish high school, and it is not clear from the record whether she received her GED. Before working for Shop Rite, Ms. Brown worked as a cook at various fast food restaurants, as a kitchen helper at a rehabilitation nursing facility, and as an assembly line worker at a compressor facility and a chicken parts processing company. Ms. Brown testified that, after this accident, she looked for other work but was unable to find anyone to hire her with her restrictions. Ms. Brown's mother testified that, after the accident, she heard Ms. Brown on the phone trying to find work at nursing homes, fast food restaurants, and day-care facilities.

The trial court stated that Angie Brown's duties as a mother, taking care of her four children, required the same abilities as those of an employer. The record reveals, however, that Angie's mother went to her house to cook and care for the children after the accident, and that Angie and her children eventually moved into her mother's apartment to make it easier for Angie's mother to care for her and her children. Angie's mother testified that she had seen Angie's eyes tear up because of the pain from her accident and that she had to help Angie with her own bath at times.

Angie Brown's pay stubs from Shop Rite, before and after the accident, indicate that she made $7.25 per hour. The WCJ found, and the parties stipulated, that Ms. Brown's average weekly wage was $290.00. The WCJ found

that she averaged working a little over thirty hours per week prior to the accident and needed to work only twenty and one-half hours per week to make ninety percent of her pre-injury earnings. Ms. Brown's check stubs however, for the eight weeks that she worked after the accident, indicate that she averaged less than four hours of work per week. After that, she could not work at all for seven months. When Dr. Ferrell released her to light duty, sedentary work, with the restrictions explained above, she could not find work.

Based upon the medical and lay testimony, and Ms. Brown's pre-injury and post-injury earnings, she has met her initial burden of proving that she could not make ninety percent of her pre-injury earnings. Accordingly, for the period of July 8, 2010, forward, we award SEBs based upon zero earnings.

### Penalties Under La.R.S. 23:1201

While the workers' compensation court awarded her total penalties of $6,800.00 under La.R.S. 23:1201(F), Ms. Brown contends that the WCJ erred in denying her penalties under La.R.S. 23:1201(I). We agree. After Ms. Brown's accident on October 10, 2009, Shop Rite paid her wage benefits and paid for the medical care of Dr. Kautz, but discontinued her wage benefits in January of 2010. The WCJ found that Ms. Brown was disabled from January to July of 2010 but awarded no penalty for Shop Rite's discontinuation of wage benefits in January. The penalties awarded by the WCJ included: an $800.00 penalty for the defendant's untimely payment of indemnity benefits for the last week of October 2009; a $2,000.00 penalty for non-payment of benefits for the first week of disability, October 10, 2009 through October 16, 2009; a $2,000.00 penalty for failure to pay for Dr. Ferrell's treatment; and a $2,000.00 penalty for the "failure to resume" the wage benefits upon receipt of Dr. Ferrell's reports.

10

Sections (F) and (I) of La.R.S. 23:1201provide in pertinent part:

F. Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. . . .

. . . .

(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

. . . .

I. Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. The provisions as set forth in R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions as set forth in R.S. 22:1892(C) shall be applicable to claims arising under this Chapter.

Accordingly, La.R.S. 23:1201(F) provides for an up to $2,000.00 penalty for each claim of *non-payment or untimely payment* of benefits unless the employer reasonably controverts the claim or shows that the violation was beyond its control. Non-payments and untimely payments subject to this penalty can include the failure to consent to a physician of choice and the failure to consent to a change of physician. Total penalties recoverable in this section are capped at

11

$8,000.00. In order to reasonably controvert a claim for untimely payment of benefits under La.R.S. 23:1201(F), "the defendant must have some valid reason or evidence upon which to base his denial of benefits." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/01/98), 721 So.2d 885, 890. The court must determine whether the defendant "possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." *Id.*

Under La.R.S. 23:1201(I), on the other hand, if the employer arbitrarily and capriciously *discontinues* benefits, the employer can be penalized up to $8,000.00 for the discontinuation. There is no $2,000.00 maximum on a single infraction. In determining whether a defendant's actions are arbitrary and capricious under La.R.S. 23:1201(I), "the crucial inquiry is whether the employer can articulate an objective reason for terminating benefits at the time of the termination." *Williams v. Tioga Manor Nursing Home*, 09-417, p. 22 (La.App. 3 Cir. 11/18/09), 24 So.3d 970, 984, *writ denied*, 10-298 (La. 4/09/10), 31 So.3d 389 (quoting *Doyal v. Vernon Parish Sch. Bd.*, 06-1088, p. 10 (La.App. 3 Cir. 2/7/07), 950 So.2d 902, 909, *writ denied*, 07-832 (La. 6/15/07), 958 So.2d 1190).

> Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. BLACK'S LAW DICTIONARY 104, 211 (6th ed.1990). Stated another way, such behavior arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 110, 333 (1966).

*Brown*, 721 So.2d at 890.

In *Williams*, 24 So.3d 970, we affirmed the OWC's finding of arbitrary and capricious (1) discontinuation of weekly benefits and (2) discontinuation of medical treatment, but we increased the awards of $2,000.00 each to $4,000.00 each, for the maximum cap of $8,000.00 under La.R.S.

12

23:1201(I). We further affirmed the OWC's award of $8,000.00 in penalties for four separate infractions under La.R.S. 23:1201(F), including (1) a miscalculation of benefits; (2) denial of medical treatment by the physician, Dr. Gunderson, with no valid reason; (3) non-payment of a hospital bill; and (4) non-payment of a pharmacy bill. Accordingly, the total penalties awarded were $16,000.00 for violations under both Sections, (F) and (I). Hence, Ms. Brown, in the present case, correctly points out that penalties can be awarded under both Sections if the criteria are met.

At the hearing on Ms. Brown's motion for a new trial, she essentially suggested that the $2,000.00 penalty awarded by the OWC under Section (F) for the "failure to resume" wage benefits based upon Dr. Ferrell's reports, should have been an $8,000.00 penalty under Section (I) for that violation. In her appellate brief, Ms. Brown suggests that Shop Rite's discontinuance was two-fold, a discontinuance of wage benefits in January 2010, and, a discontinuance of medical benefits by refusing to pay for the treatment with Dr. Ferrell. Shop Rite argues that it never discontinued the medical treatment by Dr. Kautz. The record contains the defendant's denial of Ms. Brown's request to change her orthopedic specialist to Dr. Ferrell along with its offer to continue treatment with Dr. Kautz.

Under the facts of this case, we find that the *discontinuation* of wage benefits should have been penalized under La.R.S. 23:1201(I), as explained below, but that the failure to pay for the new treatment by Dr. Ferrell was a *non-payment* properly penalized by the trial court under La.R.S. 23:1201(F). We further find that the lengthy and complete discontinuation of wage benefits under La.R.S. 23:1201(I) for a year should have been penalized at the $8,000.00 maximum provided for under Section (I).

Shop Rite discontinued Ms. Brown's wage benefits based upon reports by Dr. Kautz that were so internally inconsistent, that the discontinuation

13

was paramount to a "willful and unreasoning action, without consideration and regard for facts and circumstances presented." *See Brown*, 721 So.2d at 890. On October 29, 2009, Dr. Kautz found swelling, put Ms. Brown in a hinged brace, and took her off work, unless a light-duty position was available. He limited her to lifting no more than ten pounds. He ordered an MRI resulting in his December 15, 2009 impression of "Grade I right knee MCL strain" and "possible anterior horn lateral meniscus tear." At that time he discussed surgery with her and took her off work for the following week. Dr. Kautz reported that if Ms. Brown chose not to have surgery, he would consider "making her situation permanent and stationary."

On December 17, 2009, Dr. Kautz found mild swelling and prepared a two-page "Progress Note" wherein he indicated that Ms. Brown had decided to have the arthroscopic surgery for the suspected meniscus tear. He noted that they had discussed that the MRI findings were not definitive for a torn lateral meniscus but were suspicious for a tear and that her symptoms were persistent for over six weeks in addition to an MCL strain. On this date, he indicated that Ms. Brown was *totally incapacitated*, and he made no recommendation for her to return to work. Surgery was scheduled for January 7, 2010. Subsequently, Ms. Brown decided not to have the surgery.

Without seeing Ms. Brown again, in response to a fax from the defendant's risk management/claims adjuster, Dr. Kautz responded on January 8, 2010, that Ms. Brown could return to work with no restrictions. Shop Rite discontinued Ms. Brown's wage benefits. Based upon Dr. Kautz's internally inconsistent reports, we find that Shop Rite arbitrarily chose portions to support its discontinuation of benefits rather than investigate the inconsistencies or "ask for clarification." *See Williams*, 24 So.3d at 981.

The OWC judge noted the inconsistencies. In finding that Ms. Brown had established by a preponderance of the evidence that she was entitled to switch

14

her orthopedic specialist from Dr. Kautz to Dr. Ferrell, the OWC judge stated that, after all, Dr. Kautz had released her to full duty without further examination after saying that she needed follow-up care whether by surgery or otherwise. Accordingly, we amend the judgment of the OWC, increasing the penalties by $6,000.00, based upon our award of an $8,000.00 penalty under La.R.S. 23:1201(I) for Shop Rite's arbitrary discontinuation of wage benefits, instead of the OWC's award of a $2,000.00 penalty for "failure to resume" benefits under Section (F).

### *Attorney Fees*

The trial court awarded Ms. Brown $6,500.00 in attorney fees. We find that figure to be abusively low. Ms. Brown cites *Williams* and contends that the work done and the rationale applied in that case is applicable to the present case, supporting an award of $15,000.00 in attorney fees. We find that $14,000.00 is an appropriate fee in this case for work performed at the trial level. In *Williams,* we articulated as follows:

> Louisiana Revised Statutes 23:1201(F) and (I) both allow for the award of reasonable attorney fees in the event penalties are assessed under these two subsections. However, La.R.S. 23:1201(J) limits the attorney fees awarded pursuant to this statute to "one reasonable attorney fee." The reasonableness of an attorney fee award is based on "the degree of skill and ability exercised, the amount of the claim, the amount recovered for the plaintiff, and the amount of time devoted to the case." *Naquin v. Uniroyal Inc.*, 405 So.2d 525, 528 (La.1981); *see also Cormier v. State, Dep't of Wildlife and Fisheries*, 07-642, pp. 26-27 (La.App. 3 Cir. 11/21/07), 970 So.2d 1216, 1232, *writ denied*, 07-2466 (La. 2/15/08), 976 So.2d 186 (quoting *Lambert v. Brookshire Grocery Co.*, 06-1001, pp. 21-22 (La.App. 3 Cir. 12/20/06), 945 So.2d 918, 933).

*Williams*, 24 So.3d at 986.

Here, even though the matter was tried in one morning, counsel for Ms. Brown prepared numerous exhibits, participated in depositions and discovery, obtained medical treatment by Dr. Ferrell, SEBs, TTD benefits, and significant

15

penalties for Ms. Brown. He also filed post trial papers and filed and argued a motion for a new trial prior to this appeal.

V.

**<u>CONCLUSION</u>**

Based upon the foregoing, we reverse the denial of SEBs after July 7, 2010, and award SEBs based upon zero earnings as of July 8, 2010. We reduce the penalty award under La.R.S. 23:1201(F) by $2,000.00 and instead award an $8,000.00 penalty under La.R.S. 23:1201(I) for the discontinuation of wage benefits. We increase the attorney fee award to $14,000.00 for work done at the trial level, and award $5,000.00 for work done on appeal. Costs of this appeal are assessed to Shop Rite, Inc.

**REVERSED IN PART AND RENDERED; AFFIRMED IN PART AND AMENDED.**